IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| LATANYA THOMAS, Special Administrator of the Estate of Tyler Thomas, | 8:12-CV-412 |
| Plaintiff, | |
| vs. | MEMORANDUM AND ORDER |
| BOARD OF TRUSTEES OF THE NEBRASKA STATE COLLEGES AND JOSHUA KEADLE, | |
| Defendants. | |

In the fall of 2010, Tyler Thomas (Tyler) was a freshman at Peru State College (PSC). She was 19 years old and lived in a dormitory on campus. Defendant Joshua Keadle, then 29 years old, was also a student at PSC, and lived next door to Tyler, in the same dormitory. Tyler was last seen in the early hours of December 3, 2010. The complaint alleges that shortly thereafter, Tyler was abducted, sexually assaulted, and murdered by Keadle. Filing 123 at 1–4. Although Tyler's body has never been recovered, she has been declared dead by a Nebraska court.

Tyler's mother, LaTanya Thomas (Thomas), brings this case, asserting wrongful death claims on behalf of Tyler's next of kin, and survival claims on behalf of Tyler's estate. Thomas's claims are premised on Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) et seq. Thomas also brings state tort claims against Keadle, who has not appeared or otherwise defended this action to date. Thomas's claims against Keadle are not before the Court at this time. Rather, this matter is before the Court on the Motion for Summary Judgment (filing 181) filed by the defendant Board of Trustees of the Nebraska State Colleges (the Board), which is the governing body for PSC. The Board asks the Court to grant it summary judgment on Thomas's Title IX claims.

To state a claim under Title IX, Thomas must show that the Board had actual knowledge that Keadle posed a substantial risk of harm to Tyler, and that the Board, through deliberate indifference, exposed Tyler to that harm. This is a considerably more demanding standard than negligence. The

question before the Court is not whether the Board acted reasonably. It is not enough for Thomas to show that the Board could, or should, have done more to discipline Keadle or to protect Tyler and other young women at PSC. Rather, the law requires Thomas to show that the Board disregarded a known or obvious risk. The Court has carefully considered the parties' evidence and arguments, and concludes that the Board's conduct, while perhaps negligent, falls well short of deliberate indifference to a known or obvious risk.

Accordingly, the Board's motion for summary judgment will be granted. The Board's motion to strike and its objections to various exhibits (filing 227) will be denied as moot—the Court has considered the entire record and nonetheless finds that summary judgment is appropriate. Likewise, Thomas's motions in limine (filings 171, 173, and 218) and her motion to find Keadle unavailable as a witness (filing 230) will be denied as moot.

With Thomas's claims under Title IX dismissed, only Thomas's state-law claims against Keadle remain. The Court suspects (but, on the current record, is not certain) that diversity is lacking. However, the Court is now quite familiar with this case and will (unless Thomas wishes otherwise) exercise its supplemental jurisdiction over Thomas's remaining claims.

STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis County*, 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which

the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

FACTUAL BACKGROUND[1]

Between 2007 and 2010, Keadle transferred among several different Nebraska colleges. At one point prior to 2010, Keadle attended PSC for 1 year. *See* filing 209-2 at 13. When Keadle arrived at PSC in the fall of 2010, he was already on academic probation, due to his poor grades. Filing 204-1 at 5. At that time, Keadle was 29, and was living in the same dormitory as 18- and 19-year old female students, including Tyler, who was his next-door neighbor. Filing 211-2 at 25; filing 203-1 at 7.

Keadle's academic performance in 2010 was quite poor, to say the least. And before long, it was apparent that Keadle's academic performance would not improve; in fact, he was essentially failing all of his classes. *See, e.g.*, filing 204-1 at 6–7. And by the end of September, he had been accused of sexually harassing two female students. Filing 183-15 at ¶ 5; filing 183-17; filing 183-19. Thomas argues that, based on these incidents and several other red flags, the Board should have realized that Keadle posed a threat of sexual violence to young women at PSC.

Before moving forward, it will help to provide an overview of the PSC staff who are involved in this case. Michaela Willis served as PSC's Vice President for Enrollment Management and Student Affairs. Filing 183-15 at ¶ 2. Eulanda Cade was PSC's Director of Human Resources and its Title IX coordinator. Filing 183-4 at 4, 8. William Stonebarger was the Director of Housing and Security. Filing 183-10 at 4. And Steve Schneider was PSC's athletic director. Filing 183-6 at 4. Among these administrators, Willis was the final decisionmaker when it came to Keadle's continued presence at PSC. Schneider controlled the athletic department, but he reported to Willis. Filing 183-6 at 5, 9. And Stonebarger and Cade both lacked the authority to remove Keadle from PSC. *See,* filing 183-10 at 6, 14; filing 183-4 at 8.

## A. The Athletic Department's Background Checks on Keadle

On August 31, 2010, Keadle applied to serve as a volunteer strength and conditioning assistant for the PSC women's basketball team. Filing 183-2 at 7; filing 183-16 at 13. School policy required anyone applying to become a voluntary staff member to undergo a criminal background check and be

---

[1] Unless stated otherwise, the Court finds that there is no genuine dispute as to the following facts.

approved by PSC administration. Filing 183-2 at 7. However, the women's basketball coach allowed Keadle to serve as an assistant prior to the background check being completed. When Schneider learned of this, Keadle's involvement with the women's basketball team was terminated pending completion of the background check. Filing 183-2 at 7–8. Cade was responsible for completing the background check, which she did between August 31 and September 10. That check revealed only minor traffic offenses. Filing 183-15 at ¶ 4; filing 183-16 at 15–45.

Around the same time, PSC security came to suspect that Keadle had stolen a laptop. Filing 203-2 at 3. The matter was investigated by Stonebarger, but at some point the Nemaha County Sheriff's Department became involved. *See*, filing 203-2 at 3–4; filing 183-10 at 4. On September 12, 2010, Stonebarger received an email from Greg Conz, one of his employees (the "Conz email"). Filing 183-2 at 35. In the email, Conz informed Stonebarger that a sheriff's deputy had located criminal records relating to Keadle from Fremont, Nebraska. Filing 183-2 at 35. Keadle had previously attended Midland Lutheran College, which is located in Fremont. Filing 208-2 at 14.

The email stated, in relevant part: "[Keadle] was convicted of robbery of $300 and stealing a purse, in '09[,] also [he] has other burglary's [sic] but he was not charged for them, also has a forcible fondling (RAPE) on a 18yr old female charge on record, but the charges were droped [sic]." Filing 183-2 at 35. Stonebarger testified that he verbally informed Willis, Cade, and Schneider about the contents of the email.[2] Filing 202-4 at 15–16.

After learning that nothing significant was revealed by the first background check, Stonebarger "wasn't comfortable" and talked to the sheriff, who told Stonebarger that he needed to run a check using Nebraska's online "JUSTICE" system (a database of state trial court information). Filing 183-10 at 5–7, 15. Stonebarger then persuaded Cade to run an additional background check using that system. Filing 183-10 at 15; filing 183-4 at 6. The second check was conducted on or around September 17, 2010. *See* filing 183-16 at 2–12. In addition to minor traffic offenses, the second check revealed a misdemeanor theft conviction from 2009 in Dodge County, Nebraska (where Fremont is located). Filing 183-2 at 8; filing 183-4 at 6; filing 183-15 at ¶ 4; filing 183-16 at 4–5. But it did not contain any mention of

---

[2] The Board maintains that Willis, Cade, and Schneider did not, in fact, learn of the Conz email until after Tyler's disappearance. *See* filing 182 at ¶¶ 33, 35, 36. For purposes of the pending motion for summary judgment, however, the Board concedes that the evidence must be viewed in the light most favorable to Thomas, and so the Court will assume that in September 2010, Willis, Cade, and Schneider knew of the contents of the Conz email.

the allegation of forcible fondling; and there is no evidence that PSC officials learned anything more about that allegation prior to Tyler's disappearance.

In addition to the background checks, Schneider contacted Midland's athletic director. The Midland athletic director did not recommend hiring Keadle. Filing 183-2 at 8; filing 183-6 at 6. Schneider testified that he asked the Midland director why "and they said -- they didn't share any specifics, just didn't feel it would be a good fit for their program." Filing 183-6 at 6. Based on this lackluster recommendation and the results from the background checks, PSC determined that Keadle would not be allowed to serve as a voluntary coaching assistant. Filing 183-2 at 8.

Schneider testified that, during this process, the women's basketball coach had "kind of put together a, I guess for lack of a better term, kind of an appeal for, you know, Josh and advocating [to] have him on the team." Filing 208-2 at 32. But Schneider stood by his initial decision. Filing 208-2 at 20–21. Schneider also told the coach that Keadle was not to have any contact with the women's basketball team and was not to be associated with the women's basketball team or the athletic department. Filing 208-2 at 28–30, 45, 46.

### B. Incidents of Sexual Harassment

In September 2010, Keadle was charged with two separate violations of PSC's Code of Conduct based upon allegations of Keadle's inappropriate sexual behavior toward two female students at PSC. Filing 183-15 at ¶ 5. The Court will refer to them as "student 1" and "student 2." Both students submitted written statements.[3]

### 1. The Incident Involving Student 1

Student 1's statement was dated September 22, 2010, and stated, in full:

> I first ran into Josh, he asked me for a ride. I told him if he could tell me my name, I would. He could not remember my name, so I told him to walk and he did. The next time I saw Josh, he held the door opened [sic] for me, and asked if I was engaged. I told him no. He then replyed [sic] with good. He told me he had moved across the hall from me and I told him I knew that. Josh then said he would be up to hit on me later. I walked up to my room, set my bags down and heard a knock on the door. It was Josh, he

---

[3] The Court has considered the statements of students 1 and 2, as well as Keadle's response at the administrative hearing on student 2's complaint, not for the truth of the matters asserted therein, but as evidence of what the Board knew regarding these incidents.

said he came to hit on me. He told me that I was very pretty, I had a good body, just the way he liked. I just laughed it off. He then asked me if he had a chance with me, I told him to walk back across the hall to his room. Josh then left and I shut the door behind him. The last time I talked to Josh, he came down to the [dormitory] office when I was on duty. He told me again that I was good looking and had the type of body he liked. I once again ignored him. He then went into the game room and tried to get me to help him with his homework. I told him I did not have time because I was doing my own. He stayed down in the gameroom until I had to lock it up at 11 pm. When I locked up the office he came to the door and asked for a good night kiss. I told him no and walked up to my room. Josh was verbal [sic] harassing me every time I talked to him. I never felt uncomfortable until he asked me for a kiss and I was downstairs by myself. I was very clear when I told him no and since then he has not bothered me, other than telling me hello when he sees me in the hallway or around campus.

Filing 183-17 at 2–3.

In his written response, Keadle admitted that student 1's statement was true. But he explained that his actions (apparently referring to the kiss incident) had been taken the wrong way and were meant as a joke. Filing 183-18. Keadle pleaded "responsible" to the charge and was issued sanctions consisting of online educational activity and 10 hours of community service. Filing 183-15 at ¶ 6.

### 2. The Incident Involving Student 2

Student 2's written statement was dated September 21, 2010, and provided, in full:

My name is . . . and I have been experiencing some problems with Josh Keadle. I met him at the beginning of the semester and he was nice, but he tried to move too fast by asking to stay in my room. He also asked if I would be his girlfriend and I said no. After that he continually texted me and talked to me on facebook. He asked me when we would be going to dinner and he said that he "would only need one week and I would be his." This scared me a little and I told him that I was not interested. He continued to talk to me. I eventually became somewhat rude with him and he admitted that I was mean but it wasn't going to stop him from

- 6 -

trying because he "really likes me." I was in [a dormitory] office on duty one night and he approached me and started asking why I don't like him and why I won't give him a chance. He would not stop this conversation after I told him that I was off duty at eleven and I was going to my room. He followed me as I locked the doors and followed me to [my dormitory]. He started to get frustrated with me and I told him I was talking to another guy. He told me that he was better for me than any other guy and that I was wrong for not wanting him. I finally said I was going to bed and I went inside. He did not try to follow me thank goodness.

Last night (Sept 20th 2010) I was on duty again and he came by the office with one of his suitemates. He again asked me if he could have a chance and I said no. Later that night I was chatting with his suitemate on facebook. I noticed at one point that the conversation changed abruptly and became all about Josh and how I should like him because he likes me. A few minutes later his suitemate came down to the office and said that when he got up to go to the bathroom, Josh sat at his desk and started talking to me on chat. Josh attempted to act as his suitemate and try convincing me to date him. I was very angry and disturbed by this. I blocked Josh on facebook so he can no longer contact me and he does not have my phone number anymore either. But he does not get the hint that I do not want anything to do with him.

Filing 183-19.

Keadle was charged with violating a provision of PSC's Code of Conduct that prohibited, among other things, "inflicting unwanted physical contact on another person" and "conduct that intimidates, harasses, or threatens the safety, health, property, or life of others." Board's Exh. B5 at 1:00–2:00. Keadle pleaded "not responsible" to the second charge and the matter was referred to an administrative hearing panel. Filing 183-15 at ¶ 7. The panel received comments from Keadle and student 2. The Board has submitted an audio recording of this hearing. *See* Board's Exh. B5. Keadle first provided his account of what had occurred between him and student 2. B5 at 2:20–15:00.

Keadle explained that he met student 2 on the first day of school, which was a Monday. Over the next few days they began a brief physical relationship and slept together once in student 2's room. By Wednesday student 2 texted Keadle to tell him that things were moving too fast and, as a result, they stopped seeing each other for a time. B5 at 2:20–5:00. A few

weeks later, on the weekend of the first football game, there was a dance. Student 2 saw Keadle there and sent him a text to say "thanks for coming." They then began texting again. They made plans to watch a movie after the dance, but that didn't pan out, and they didn't have much contact for a while after that night. What conversation they did have, he characterized as her being rude to him. B5 at 6:20–7:20. One night, Keadle saw student 2 on duty at the station and asked why she was acting this way. They talked for a long time and eventually when she was off duty at 11:00 they continued to walk and talk on the way to her dormitory. Keadle said that they had a conversation about whether they might date. She was not receptive to the idea. But, he said, the conversation never became hostile. B5 at 7:20–10:30.

Keadle denied that he had used his suitemate's Facebook account to chat with student 2. He claimed that while his suitemate was talking to student 2 on Facebook, Keadle asked his suitemate to ask her some questions about what she thought about Keadle. B5 at 10:30–12:30, 31:40–32:10.

The panel also heard from student 2. She stated that she had contacted Seth Bingham, the Residence Hall Director, because she felt uncomfortable. B5 at 24:30–25:20; filing 203-2 at 2. But student 2 explained that she didn't want a hearing—Bingham had her write the report, and he initiated the hearing process. Student 2 stated that the allegations were "very, very harsh" and she explained "I believe there was some harassment, but not like, not like you were threatening me in any way, not like you were cornering me. I was just uncomfortable." B5 at 24:30–25:20.

The following exchange then occurred:

Keadle: Did I not ask you, like, dozens of times, [student 2], if you don't want anything to do with me, just tell me that, I will respect your wishes and leave you alone.

Student 2: You did ask me that.

Keadle: Did you ever say, Josh, I don't want nothing to do you with you, you're harassing me, please leave me alone.

Student 2: No, I did not. I was just trying to be respectful by not making you mad or--And I--I understand that I should have just said, leave me alone. But, again, I didn't want you to get in trouble. . . . I didn't ask for you to be put in front of a panel and that's not what I wanted. I approached Seth just because I was uncomfortable with it--And, it's up to the panel now. I don't have any control over it. What all happened, happened. We can't take

any of it back. This is just where we're at right now. And I apologize.

B5 at 25:15–26:15

     Keadle asked student 2 if she thought any of his statement was untrue. Student 2 said only that "small details" were not correct, but also explained that the events had taken place weeks ago and she had not been thinking about it. B5 at 26:45–27:10. Student 2 explained that she had omitted their initial encounters because she did not see how it was relevant, because most of what had made her uncomfortable—Keadle's insistent bothering her—happened 2 or 3 weeks after that. 27:20–28:00.

     The hearing panel asked student 2 for any additional information. Student 2 said that the biggest thing that made her uncomfortable was the Facebook incident. She was sure that it was Keadle because his suitemate told her about it. And she was sure it had been Keadle because the online conversation had completely shifted from being about a movie to all of the sudden being about Keadle and what she thought of him. Student 2 admitted that it may have been that Keadle had been asking his suitemate to ask her questions, but explained that she still considered that strange and it made her very uncomfortable. Student 2 explained that what she really wanted was for Keadle to leave her alone, and that he had left her alone since he received word of the complaint. She explained that she had trouble being blunt enough to just tell him to leave her alone. B5 at 29:00–30:50.

     A panel member asked student 2 if she was scared to tell Keadle to leave her alone. Student 2 said that she was not scared, but that she was worried about upsetting him, and explained that she did not like upsetting people. Student 2 stated "I didn't--I was relatively sure that it's not like he would come back at me with anything." B5 at 30:40–31:30.

     On October 14, 2010, based upon the information presented, the hearing panel found Keadle was not responsible for the alleged Code of Conduct violation. Filing 183-20.

## C. Stonebarger Recommends Removal

     On September 23, 2010, while the sexual harassment charges were pending resolution, Stonebarger recommended to Willis that Keadle be removed from the dormitories if he pleaded responsible. Filing 183-10 at 8; filing 202-4 at 60. Willis disagreed, because that would not have been a typical response to a first offense involving conduct that had made other students uncomfortable but did not involve harm or threats. Instead, Willis recommended educational activity, community service hours, and perhaps a

probationary period, with more extensive consequences to follow if the behavior continued. Filing 183-2 at 13–14; filing 202-4 at 63.

## D. Keadle's Failure to Complete Sexual Harassment Sanctions

As noted above, Keadle was ordered to complete an online educational module and 10 hours of community service as a sanction for the incident of sexual harassment he admitted. Keadle was given until October 22, 2010, to complete the sanction, but failed to do so. He was then given an additional week, but never completed the sanctions. Filing 183-2 at 10.

Willis testified that although Keadle could have been dismissed from PSC for failing to complete the sanctions, that would have been out of line with PSC's general past practices. Instead, Willis explained, when a student failed to complete a sanction, generally a hold would be placed on his account so he could not proceed beyond that semester, and PSC officials would make an effort to help the student complete the sanction. Filing 183-2 at 10. Willis further testified that Keadle's failure to complete sanctions did not warrant expulsion because they were imposed in response to a single incident of sexual harassment, and because the incident did not rise to that level of seriousness. Filing 183-2 at 10.

## E. The Door Incident

In October 2010, Keadle committed another Code of Conduct violation. Keadle kicked down the door to his dormitory room after he had somehow become locked out of the room. Filing 183-2 at 10. Keadle was required to attend a meeting regarding this incident but did not do so. Filing 183-2 at 18; filing 202-4 at 29–30. The matter was turned over to Nemaha County authorities, and as of December 3, 2010, was being processed in the court system. Filing 183-2 at 10. Additionally, at some point after this incident, a hold was placed on Keadle's account. *See* filing 213 at ¶ 240.

After missing the first meeting, Keadle was supposed to meet with Willis on December 1, 2010, but he also missed this meeting. Filing 208-1 at 1. In an email to Bingham regarding this failure, Willis stated that she would notify Keadle that he would be required to meet with Stonebarger on December 6, and that if he did not attend that meeting, he would be barred from returning to PSC in the spring. Filing 208-1 at 1.

## F. Tyler's Disappearance

Tyler was last seen walking alone, on campus, around 1:00 a.m. on December 3, 2010. Filing 183-10 at 12; Thomas's Exh. V [video surveillance footage]. It appears that Keadle is the only person alive who may know what happened to Tyler. But he has invoked his privilege against self-

- 10 -

incrimination and refused to participate in Thomas's attempt to depose him. The only other sources of information are statements Keadle made to police throughout the course of several interviews. In those interviews, Keadle changed his story several times, but eventually placed himself alone with Tyler near the Missouri River, early on the morning of December 3, although he denied harming Tyler. Thomas asserts that Keadle is responsible for Tyler's death, and for purposes of the pending motion, the Court will assume that a jury could reasonably find that to be true.

ANALYSIS

In Title IX, Congress took action against discrimination on the basis of sex in any educational program that receives federal funding. *Roe v. St. Louis Univ.*, 746 F.3d 874, 881 (8th Cir. 2014). The statute provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Supreme Court has found an implied private right of action for individuals whose Title IX rights have been violated, and held that this may support a claim for money damages. *See, Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60 (1992); *Cannon v. Univ. of Chi.*, 441 U.S. 677 (1979).

Sexual harassment constitutes "discrimination" under Title IX, and in certain limited circumstances, a funding recipient may be subject to liability for student-on-student harassment. *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 644, 650 (1999). However, funding recipients may only be held liable for damages caused by their own misconduct. *Id.* at 640–41. Thus, the recipient *itself* must exclude persons from participation in, deny persons the benefit of, or subject persons to discrimination under the recipient's programs and activities. *Id.*

To state a Title IX claim based on peer harassment, a plaintiff must produce evidence to support the following elements. As a threshold matter, the defendant must be a Title IX funding recipient. *Id.* at 640. Then, the plaintiff must show that the defendant was (1) deliberately indifferent (2) to known acts of discrimination (3) which occurred under its control. *Id.* at 644–650; *Wolfe v. Fayetteville, Ark. Sch. Dist.*, 648 F.3d 860, 864 (8th Cir. 2011). Per the language of Title IX, the acts of discrimination must be "on the basis of sex." *Wolfe*, 648 F.3d at 864. And peer harassment can constitute actionable "discrimination" only if it is so severe, pervasive, and objectively offensive that it effectively deprived the plaintiff of access to the educational opportunities or benefits provided by the defendant. *Id.* (citing *Davis*, 526 U.S. at 650).

- 11 -

The Board does not dispute that it is a federal funding recipient. And there is no doubt that if the facts alleged in the operative complaint are true, Tyler experienced severe sexual harassment that qualifies as discrimination. *See Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir. 1999). The Board argues, however, that Thomas has failed to produce evidence to create a genuine issue of material fact as to the remaining elements: that the Board had actual knowledge of prior acts of discrimination by Keadle; that the alleged abduction, sexual assault, and killing took place in a context subject to the Board's control; and that Tyler was made vulnerable to these acts as a result of deliberate indifference by the Board. The Board also asserts that Thomas has not produced sufficient admissible evidence that Keadle played a role in Tyler's disappearance.

The Court finds that Thomas has not produced evidence sufficient to raise a genuine issue of material fact on the elements of actual knowledge and deliberate indifference. Therefore, the Court does not reach the issues of the precise role Keadle may have played in Tyler's disappearance, or whether any of Keadle's alleged conduct occurred in a context subject to the Board's control.

### A. Actual Knowledge of Prior Acts of Harassment

To state a claim for peer harassment under Title IX, Thomas must allege facts showing that an appropriate school official had actual knowledge of discrimination in the school's programs. *Roe,* 746 F.3d at 882. An appropriate official is one who, at a minimum, had the authority to address the alleged discrimination and institute corrective measures on the school's behalf. *Id.* This is not a negligence standard, and liability cannot lie for what the school should have known. *Davis,* 526 U.S. at 642.

In the related context of teacher-student harassment, the Supreme Court has held that a single complaint of a teacher making inappropriate comments "was plainly insufficient to alert the principal to the possibility that [the teacher] was involved in a sexual relationship with a student." *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 291 (1998). However, "'the actual notice standard does not set the bar so high that a school district is not put on notice until it receives a clearly credible report of sexual abuse from the plaintiff-student.'" *Escue v. N. Okla. Coll.,* 450 F.3d 1146, 1154 (10th Cir. 2006) (quoting *Doe v. Sch. Admin. Dist. No. 19,* 66 F. Supp. 2d 57, 62 (D. Me. 1999)). Instead, courts have generally held that the school must have "'actual knowledge of a *substantial risk* of abuse to students based on prior complaints by other students.'" *Id.* (quoting *Doe A. v. Green,* 298 F. Supp. 2d 1025, 1033 (D. Nev. 2004)); *see also, Bostic v. Smyrna Sch. Dist.,* 418 F.3d 355, 361 (3d Cir. 2005); *Vance v. Spencer Cnty. Pub. Sch. Dist.,* 231 F.3d 253,

260 (6th Cir. 2000); *Gordon ex rel. Gordon v. Ottumwa Cmty. Sch. Dist.*, 115 F. Supp. 2d 1077, 1082 (S.D. Iowa 2000).

The concept of "actual knowledge" under Title IX has several components. Three of those components are particularly relevant in this case. First, as discussed above, Title IX imposes liability only if there is discrimination "on the basis of sex." *See Wolfe*, 648 F.3d at 865. Thus, if a harasser's prior conduct is not sexual in nature or committed on the basis of sex, it will be more difficult for that conduct to provide the actual notice that is a prerequisite to liability under Title IX.

Second, there is a "severity" component. Liability will only attach where the school acts with deliberate indifference to acts of "discrimination" of which the school has actual knowledge—that is, acts that are so severe, pervasive, and objectively offensive that they can be said to deprive the victim of access to the educational opportunities or benefits provided by the school. *Davis*, 526 U.S. at 650; *Doe v. Galster*, 768 F.3d 611, 614, 617–18 (7th Cir. 2014). So, if school has actual knowledge only of prior conduct that is not sufficiently severe to constitute discrimination under Title IX, it will be more difficult to prove that this prior conduct shows actual knowledge of a substantial risk of actual discrimination. Of course, a harasser's conduct may escalate in severity over time, and there is no "free pass" for a school just because the conduct at issue is the first to rise to the level of Title IX discrimination. But it is equally true that the lack of severity in a harasser's prior known misconduct will tend to undermine a claim that the school should have known the harasser posed a substantial risk of severe misconduct. *See, e.g.*, *Escue*, 450 F.3d at 1154.

Third, there is a "credibility" component. For example, in *Shrum ex rel. Kelly v. Kluck*, the school was aware that the police had investigated a complaint that a teacher, Kluck, had inappropriately touched teenage students. 249 F.3d 773, 775 (8th Cir. 2001). However, the police investigation found that while Kluck had made inappropriate remarks, there was no evidence of physical contact. *Id.* A year later, the school received complaints of inappropriate comments and touching by Kluck from 16 students. *Id.* Kluck subsequently left the school and went to teach at another school, where he molested a child. *Id.* at 776. The Eighth Circuit held that, on these facts, the first school "did not have any actual knowledge of the extent of Kluck's misconduct; it was aware of rumors, investigations, and student statements, but did not possess any conclusive proof that Kluck actually molested students while employed [at the first school.]"[4] *Id.* at 780, 782. Similarly, in

_____

[4] This Court doubts that the *Shrum* court intended to set the bar for actual knowledge under Title IX as high as the phrase "conclusive proof" would tend to suggest. *Shrum* is

- 13 -

*Plamp v. Mitchell School Dist. No. 17-2*, the school was found not to have possessed actual knowledge where it knew only of "vague complaints" of a teacher's misconduct. 565 F.3d 450, 457 (8th Cir. 2009).

Prior to December 2010, the Board knew the following: that Keadle had been accused of sexually harassing two young women at PSC, and had pleaded responsible to one of the accusations. Although the conduct involving student 2 was determined not to constitute a violation of PSC's Code of Conduct, the Board was, of course, still aware of the facts underlying student 2's complaint. The Board also knew that Keadle had a minor criminal record, and that someone had, somewhat recently, made an allegation of "forcible fondling (RAPE)," although that allegation was neither prosecuted nor confirmed. The Board was also aware of other circumstances which Thomas characterizes as red flags, including, for example, the incident with the door and the fact that Keadle was failing all of his classes and was an older student living among younger, female students. While these other circumstances are relevant to the Court's analysis, in the end they are not acts of discrimination on the basis of sex, nor do they tend to show that Keadle posed a substantial risk of abducting, sexually assaulting, and murdering a fellow student. The most significant facts, then, are those underlying the two accusations of sexual harassment, followed by the forcible fondling allegation.

The two allegations of sexual harassment amounted to, essentially, charges that Keadle had made two young women uncomfortable because he pestered them, had asked one for a kiss, and had—although it is subject to dispute—briefly pretended to be someone else on Facebook's chat feature. Although student 1 complained that Keadle had verbally harassed her, she also stated that she "never felt uncomfortable" with Keadle until he asked her for a kiss when she was alone with him briefly. Filing 183-17 at 3. And she explained that after she clearly told him "no," he had not bothered her. Filing 183-17 at 3.

Student 2 admitted that Keadle's account of what transpired with her was essentially correct, and so it appears that, for an initial period, she reciprocated his interest. Student 2 admitted that she never told Keadle to leave her alone and that while his insistence bothered her, what made her most uncomfortable was the incident on Facebook. Viewed in the light most

---

nonetheless relevant for the broader principle that the credibility and source of a school's notice are relevant factors to consider. However, prior instances need not be clearly credible because, *at some point*, a supervisory school official knows that a school employee is a substantial risk to sexually abuse children. *Gordon*, 115 F. Supp. 2d at 1082; *accord, Doe v. Sch. Bd. of Broward Cnty., Fla.*, 604 F.3d 1248, 1259 (11th Cir. 2010); *Escue*, 450 F.3d at 1154.

favorable to Thomas, the Facebook incident would demonstrate that Keadle is dishonest and something of a creep. If it had ever been repeated or involved a more substantial deception, comparisons to stalking behavior would become apt. But as it was, student 2 told the hearing panel that all she wanted was for Keadle to leave her alone, she admitted she had not been direct with him about that, and that once she did so—by filing her complaint—he had left her alone.

Neither complainant reported unwanted physical contact or threatening behavior. And neither of these reports amounted to the level of severe and offensive conduct necessary to qualify as "discrimination" under Title IX. The record simply does not show that Keadle's harassment of student 1 or student 2 interfered with their access to education. Moreover, neither of these incidents involved anything even remotely approaching the same degree of severity as Keadle's alleged acts against Tyler. *See, e.g., Doe v. Flaherty*, 623 F.3d 577, 585 (8th Cir. 2010); *Escue*, 450 F.3d at 1154. This is not to undermine the very real discomfort that student 1 and student 2 no doubt experienced. Nor is it to suggest that Keadle's behavior toward student 1 or student 2 should in any way be excused or condoned. But for Title IX purposes, what matters are the facts that were available to the Board. And based on these facts, a jury could not reasonably conclude that the Board had actual knowledge that Keadle posed a substantial risk of abducting or sexually assaulting fellow students.

By comparison, the allegation that Keadle has previously committed "forcible fondling (RAPE)" involves a severity lacking in the previous incidents. But the full extent of the Board's knowledge of this incident is contained in the Conz email. Based on this vague and terse description, the Board had no knowledge of either the seriousness or the veracity of the allegation, nor why the allegation was ultimately not prosecuted. The two background checks conducted by the Board failed to reveal any mention of this allegation—or any other serious crimes, sexual or otherwise. And the two incidents the Board *did* know about involved no unwanted physical contact such that this unprosecuted allegation could be viewed as part of a pattern or propensity to engage in more serious sexual misconduct. In short, the Conz email added little, if anything, to the Board's actual knowledge.

That brings the Court to the remaining "red flags." Among other things, Thomas points to the fact that Keadle was an older male living in proximity to young, female students; that he was essentially failing all of his classes; that he committed a "violent felony" when he kicked down his door, thus demonstrating his anti-social and violent tendencies; and that he lied on his residence application which asked if he had ever been convicted of a crime. Simply put, these matters do not involve sexual harassment, or Keadle's

conduct toward women, nor do they demonstrate that he posed a substantial risk of sexually assaulting a fellow student.

The incident with the door involved Keadle kicking down his own door when he was locked out. This apparently caused around $2,500 in damage. Filing 183-2 at 11. So, as Thomas points out, it qualifies as a potential felony. *See* Neb. Rev. Stat. § 28-519(2). But, as emphatically as Thomas may characterize this as a "violent felony," kicking down the door to one's *own room* is a far cry from perpetrating heinous acts of personal violence.

Thomas also highlights the fact that Keadle lied on his housing application—or, more accurately, failed to completely fill it out. The application asked: "Have you ever been convicted of a law violation or adjudicated under the jurisdiction of a juvenile court for an act that resulted in probation, community service, a jail sentence or revocation or suspension of your driver's license?" Filing 202-3 at 96. Keadle failed to answer this question. Filing 202-3 at 96. At some point, this fact came to Bingham's attention, and he brought it to Stonebarger's attention. Bingham asked Stonebarger if it presented another ground for removing Keadle from the dormitory. *See* filing 202-3 at 89; 203-2 at 6, 12. Willis had also learned of the omission because she had pulled Keadle's housing application after receiving the background checks in September. *See* filing 202-3 at 22. But Thomas has not pointed to any evidence that Keadle could not have truthfully answered this question in the negative. Keadle's most serious prior conviction (for misdemeanor theft) resulted in a fine, not jail or probation. Filing 183-16 at 5. PSC had already conducted two background checks on Keadle when it learned that he had omitted the answer on the housing application. And the background checks revealed no serious crimes, no crimes of a sexual nature, and nothing to suggest that Keadle posed a substantial risk of sexually assaulting his fellow students. In short, this argument is not persuasive, and this fact adds very little to the actual knowledge possessed by the Board.

Thomas also points to the fact that Stonebarger wanted Keadle removed from campus, and Schneider determined that the women's basketball team should have no contact with Keadle. But Stonebarger and Schneider were not aware of any facts beyond what Willis knew.[5] The fact that, based on the same information, these officials either took, or desired to take, other steps does not add significantly to the actual knowledge calculus of this case.

In sum, the incidents of peer harassment and the unprosecuted fondling allegation were, considered together, not enough to give the Board

---

[5] This is viewing the facts in the light most favorable to Thomas. Willis denied that Stonebarger informed her of the Conz email.

actual knowledge that Keadle posed a substantial risk of sexually assaulting another student. And the other circumstances, which are even further removed from a threat of sexual assault, do not tip the balance. Even viewing the facts in the light most favorable to Thomas, a jury could not reasonably find otherwise.

Thomas generally argues that PSC officials should have conducted a more thorough investigation. Had they done so, Thomas argues, they would have learned that Keadle had a history of making misogynistic and vulgar comments to other female students, who considered him a "pervert" and found him "unnerving." *See, e.g.*, filing 203-1 at 3, 7–9, 11; filing 204-3 at 16, 19, 49, 52, 56–57. But those students have admitted that they never complained to PSC staff about Keadle's behavior. *See*, filing 203-1 at 10; filing 204-3 at 19, 54. And the standard for liability under Title IX is "not satisfied by knowledge that something might be happening and could be uncovered by further investigation. The standard is 'actual knowledge.'"[6] *Galster*, 768 F.3d at 617–18.

### B. Deliberate Indifference

The deliberate indifference standard is a "rough parallel" to the Title IX administrative enforcement scheme, which is based on an "official decision by the recipient not to remedy the violation." *Gebser*, 524 U.S. at 290. Under a lower standard, there would be a risk that the recipient would be liable in damages not for its own official decision but instead for its employees' independent actions—or here, the actions of a student. *See id.* at 290–91. The *Gebser* Court "saw '[c]omparable considerations' under Title IX to those underlying the deliberate indifference standard under § 1983." *Roe*, 746 F.3d at 882. And in the § 1983 context, the deliberate indifference standard has been "described as 'stringent' and 'requiring proof that [the official] disregarded a known or obvious consequence of his action.'" *Id.* (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 410 (1997)). Thus, deliberate indifference is not a "mere 'reasonableness' standard." *Davis*, 526 U.S. at 649. On the contrary, a funding recipient must respond to known peer harassment in a manner that is not clearly unreasonable under

---

[6] Similarly, Thomas points to a September 22, 2010 email from Bingham to Willis, in which Bingham wrote that one student had come forward to complain of sexual harassment and that that student stated that "there are at least two other student[s] involved." Filing 203-2 at 6–7; filing 202-4 at 62. But in his deposition, Bingham admitted that besides student 1 and student 2, no other student came forward to him or complained to him about Keadle's behavior. Filing 203-2 at 7. If there was a third student involved, the Board never learned anything more of the matter. That the Board might have learned more from a more thorough investigation is speculation, and is not enough to show actual knowledge. *See Galster*, 768 F.3d at 617–18.

the known circumstances. *Id.* at 648. When considering cases under Title IX, courts must refrain from second-guessing the disciplinary decisions made by school administrators. *Id.*

Based on the facts it knew, the Board's response—while far from thorough, and perhaps even negligent—was not deliberately indifferent. Once PSC officials became aware of the Conz email, a second background check was conducted. Those background checks revealed nothing that would suggest a propensity for sexual violence. Once PSC learned of allegations of sexual harassment by its students, it promptly examined the complaints. Keadle pleaded responsible to the first, but it involved only him briefly making a fellow student uncomfortable. In response, PSC imposed sanctions. The second allegation resulted in a full hearing, based upon which PSC officials decided no actionable misconduct had occurred. Given the testimony provided at the hearing, that decision was not clearly unreasonable.

It is true that PSC failed to follow through—Keadle did not complete the sanctions imposed, and nothing ever came of that failure. But based on the nature of the underlying violation, and the lack of any further acts of sexual harassment, PSC's failure to do more was not deliberate indifference. This is not a case where the school had actual knowledge that its remedial efforts were ineffective, and yet continued to use those same methods to no avail. *See, e.g., Vance*, 231 F.3d at 261. Following through to make sure Keadle completed those sanctions would have been prudent. And, as Thomas contends, Keadle may even have been emboldened by the fact that nothing came of his failure to complete those sanctions. But those sanctions were imposed in response to a single occurrence of sexual harassment that involved no physical contact. And a jury could not reasonably find that a known or obvious consequence of this failure to follow through was that Keadle would sexually assault and murder another student.

Additionally, after the door incident, and Keadle's failure to show up for required disciplinary meetings, a hold was placed on his academic account. And that meant that, barring an (extremely unlikely) about-face, Keadle would not be allowed to return to PSC in the spring semester. The Board was not deliberately indifferent for failing to expel him sooner, or for failing to expel him based solely upon his abysmal academic performance.

Thomas points to the fact that Cade, PSC's Title IX coordinator, was not informed of the sexual harassment allegations. And, Thomas argues, had Cade been so informed, she could have conducted an investigation into Keadle. But it is not enough to show that further investigation might have revealed more. *See Galster*, 768 F.3d at 617–18. And in any event, other than Keadle's misogynistic and vulgar comments toward other female students, Thomas has not explained what this investigation would have uncovered. The

Board's response was not deliberately indifferent—and the fact that Cade was not involved does not change that. *See Gebser*, 524 U.S. at 291–92 (failure to follow Title IX's administrative protocols does not prove deliberate indifference).

Thomas also asserts that the hearing on student 2's allegations was a "sham," and that this demonstrates the Board's deliberate indifference. In support, Thomas has produced an affidavit from student 2, who avers that she made her report to Bingham because she "was scared, being in [Keadle's] presence made me uncomfortable and I found him to be creepy. Keadle had been harassing me, showing up at work etc. I wanted him to leave me alone." Filing 206-3 at ¶ 3. Student 2 further avers that Bingham asked her to make a written report, which Bingham said he would submit to security. Student 2 thought that that was as far as the matter would go. Filing 206-3 at ¶ 4. On October 12, 2010, student 2 received an email asking her to attend a hearing on the matter to take place on October 14. Student 2 states that she was surprised to learn that a hearing would take place, and she did not know that professors she knew would be sitting on the panel, that Keadle would be there, that her statement would be read aloud, or that Keadle had made a written response. As a result, student 2 avers that she felt unprepared for the hearing, that she was humiliated and treated poorly, and that she felt ambushed and intimidated by Keadle's presence. Filing 206-3 at ¶¶ 6–11. Student 2 explained: "Although near tears, I didn't want to break down in front of everyone, I just wanted Keadle to leave me alone, I had never asked for a hearing and felt as if I were the one on trial for reporting his inappropriate behavior." Filing 206-3 at ¶ 11.

After the hearing, student 2 and Keadle were excused at the same time, and they ended up outside the hearing room with no one else around. Student 2 tried to find a professor or someone else she knew but could not, and Keadle ended up walking with her back to her dormitory, which made her very uncomfortable. Filing 206-3 at ¶ 12. Additionally, student 2 avers that after 3 weeks had passed without PSC informing her of the outcome of the hearing, she had to contact Bingham and Stonebarger to find out what had happened. Filing 206-3 at ¶ 13–14.

It certainly appears that student 2 was treated poorly, and that the Board could have handled her hearing and complaint more competently and with greater sensitivity. But student 2 is not the plaintiff in this case. And Thomas has not shown that, as it relates to Tyler, PSC's poor handling of the hearing amounted to deliberate indifference.

More specifically, Thomas has not produced evidence from which a jury could reasonably conclude that a better hearing for student 2 would have resulted in a different outcome for student 2's complaint or uncovered facts

showing that Keadle posed a substantial risk of abducting or sexually assaulting another student. Student 2 avers that she was scared and found Keadle creepy—but she did not tell that to the Board; in fact, she specifically denied that she found him threatening. Nor, in her affidavit, does student 2 dispute Keadle's account of what occurred, except to state that he provided "false detail" in his description of his encounters with her. Filing 206-3 at ¶ 11. She does not explain what these false details were, or their significance. Similarly, student 2 states that "[d]uring the hearing I was apologetic and stated that I didn't want to get Keadle in trouble. I said this as I felt ambushed and intimidated by Keadle's presence." Filing 206-3 at ¶ 11. But student 2 does not aver (had the hearing been conducted in a better manner) what evidence would have been adduced that was substantively different. Instead, in her affidavit, student 2 avers that she responded to Bingham's email by writing back that she was "worried about the harshness" of the charges and that "all I wanted was for [Keadle] to leave me alone and that he had done that." Filing 206-3 at ¶ 8.

It is understandable that student 2 felt unprepared and intimidated. But the issue, under Title IX, is not what this Court might surmise a better hearing could have uncovered. Rather, it is whether the Board was deliberately indifferent based upon what it actually knew. And the fact that student 2's complaint was handled poorly does not rise to the level of deliberate indifference in Tyler's case.

### CONCLUSION

The Board did not have actual knowledge of facts suggesting that Keadle posed a substantial risk of abducting and sexually assaulting a fellow student. Thomas argues that, based on what it did know, the Board should have done more to investigate and prevent what happened to Tyler. If the Court "accepted that argument, however, [it] would be substituting a negligence standard for both the severity and deliberate indifference standards that control" claims under Title IX. *Galster*, 768 F.3d at 619.

What happened to Tyler is a profound tragedy. But the law does not permit this Court to judge the Board with the benefit of hindsight, and for the reasons stated above, the Board's response to the facts of which it had actual knowledge did not arise to the level of deliberate indifference.

THEREFORE, IT IS ORDERED:

1.     The Board's Motion for Summary Judgment (filing 181) is granted. Thomas's claims against the Board are dismissed.

- 20 -

2.    The Board's motion to strike and its objections to various exhibits (filing 227) are denied as moot.

3.    Thomas's motions in limine (filings 171, 173, and 218) and her motion to find Keadle unavailable as a witness (filing 230) are denied as moot.

Dated this 28th day of July, 2015.

BY THE COURT:

John M. Gerrard
United States District Judge